Good morning, Your Honors, and welcome back to Alaska. Thank you. My name is Rich Kertner, and I represent Mr. Mujahid. And I'd like to today just focus on two of the issues we brought up in our appeal. That is Mr. Mujahid's motion for a new trial based on his jury challenge and also our alleged giglio violation on one of the witnesses. And to put these two issues in context, I'd like to briefly recite the facts. Mr. Mujahid was under investigation by federal agents on a sex trafficking case, and they had a search warrant to search his home and his car and had the home under surveillance. They saw Mr. Mujahid just before they executed the search warrant go to a storage shed behind his building and carry a bag into the trunk of the car that he was driving. And later on that day when they executed the search warrant, they opened the trunk. They found that the bag had a gun and ammunition, and that was the basis of his charges. He has prior felony convictions, and so they charged him with a felony possession. Now, Mr. Mujahid's defense at trial was that one of the other people who lived in that apartment building, who was a friend of his or an acquaintance, Mr. Zabato, actually it was his gun, and he asked Mr. Mujahid to put the bag in the trunk of the car, and this was Mr. Mujahid's testimony. And at trial, Mr. Zabato, who had been a cooperating witness or informant for the government for some time on this other investigation, was not called by the government in this particular case. Mr. Mujahid did call him because he had to establish certain facts as part of his defense. Now, what the defense knew about Mr. Zabato was that he had bought the ammunition shortly a couple days before this incident, before the search, and that he lived there, and this actually, the storage shed, Mr. Zabato had access to it, and it was his shed. So what the defense didn't know, and we submit the government did know, are these other factors about Mr. Zabato, the fact that he was the subject of a federal fraud investigation, a civil action from the Katrina tragedy. Counsel, on this issue, the Giglio issue, was that argument properly preserved in the district court? That is one of the problems in this case, is that we didn't get this information from the government until it was provided as Giglio in the other investigation that's ongoing. So it wasn't even known to the defense. It was provided after the trial, after the sentencing, after the notice of appeal was filed. And so it's sort of similar to the issues we've had here recently with the political corruption cases in Alaska, United States versus COT, United States versus COIN, where information was provided after the trial during the appeal process. So in retrospect, I think now that probably what we're asking for today is a remand, just like in COT and COIN, to the trial court to really assess, is this a Giglio violation, was it annoying, and was it prejudicial to Mr. Mujahid. And that was not something we could raise before the notice of appeal was filed. Counsel, let's suppose that, well, here's the question I want to ask. Is it clear that the government had an obligation to turn over the adverse information about Mr. Zapata on your witness? Is it clear? Yes. I think so. I think that they have a duty. What case do you have? I don't have any case. And I guess it's a unique situation. What makes it clear? Because I think that the basis of Giglio and Brady is if the government has information that is exculpatory or can be impeachment material for a witness, and especially in this case a hostile witness. I mean, the only difference in this case, they could have called Mr. Zapata. The fact that he's a hostile witness is a curious twist to it. But let's suppose that Mr. Mujahid was calling his girlfriend or an ex-girlfriend to come and testify about something, and the government happened to know that she had a criminal record. Is the government under an obligation to turn that over? I would say that's different because Mr. Zapata was a working informant for the government. And so there's that closer relationship. It's not that they have a duty to go out and investigate. The problem is that we end up with some real gray areas here as to when the government is obligated to turn over information to you on your witness. It's not their witness that they're bringing into court. It's your witness. Well, it was only our witness because of the circumstances. We anticipated that he would be a government witness. He is going to be a government witness in a future trial. But he wasn't the witness in this case. No. And you presumably had some kind of access to him or should have had some kind of knowledge as to what you thought he was going to testify to before you put him on. We did our own investigation. We actually got videotape of him purchasing the ammunition two days before at a Wal-Mart. Could you have discovered with reasonable efforts any of his prior criminal or civil difficulties? It was an old theft conviction. But what we couldn't have access to was his statements to federal agents during their investigation that he made false statements. That was provided to us in our discovery after the trial. He made false statements in an investigation that was known to the government. Could you have asked for that? Could I have asked? If you knew that this was a hostile witness, you would anticipate the government might call him. The government decides not to call him. You bring him in. Could you have gone to the government or gone to the district court and said, We're bringing this guy in. He's a hostile witness. And we are asking that the government turn over any giglio evidence that they may have. I suppose we didn't make that specific request. There is also evidence that the government had during this investigation that he was using drugs. In fact, I think that in this trial, the prosecutor, the assistant U.S. attorney, asked him about drug use and he denied it. And that's the information they would have had about his drug use. So there's certain information that they had as part of the investigation that they had in the process of getting a search warrant that our position is that they have some responsibility, if they have this information, if it's going to be exculpatory for a defendant. It can't be a great surprise to you that Mr. Zapata had a prior criminal record. Well, it was actually not a surprise. But he might have had a criminal record. No, that would not have been a surprise. So either you could have tried to discover it on your own or you could have asked the government to turn it over and then gone to the district court and complained, and he didn't. And often the defense doesn't have the resources that the federal government has. And when they do have, when the U.S. attorney's office has this information, then, and for example, the fraud suit brought by the government where there was a default judgment against Zapata, that's something that they would have had and could have provided. Counsel, before you run out of time, I appreciate your talking a little bit, if it's all right with my colleagues, talk a little bit about the cross-section of the jury question. And specifically what I'm wondering, although neither party argued about this, and maybe there's a good reason for that, the actual jury as seated was really a very good cross-section of the community. With two Native Americans, one African American, and one Hispanic on the jury, is that relevant in determining whether the method of choosing a jury results in a cross-section when you can see that in his case it actually did? No, I don't think so, because all the case law looks at the pool. Well, I know it does, and I'm just wondering whether it has to stop there with blinders on as to what actually happened. I suggest not. One of the problems when we did, and the trial court did order an investigation into the jury pool and the racial makeup of that, but one of the problems in this case is that the judge used a Ninth Circuit test of an absolute disparity. And the problem with that test, and basically the government argues anything under 7.7% absolute disparity is reasonable. Well, in Anchorage, in Alaska, when you have an African American population that is below that, we'll never make that threshold. We'll never prove that there's an absolute disparity of over 7.7%, even if no African Americans ever appear here. And I cited a Sixth Circuit case where they took a different approach, and they did a comparative disparity. And I think that is just an important issue to address in this case, because as we all know in this circuit, minorities are increasingly overrepresented in criminal prosecutions, underrepresented in jury pools, and it's a continuing problem. And if you use an absolute disparity test of 7.7%, then you'll never make that threshold, at least for somebody like Mr. Mujahid in Alaska. Can we address that issue? Can this panel address that issue under the law of the circuit? Well, that is a good question, and I think it's an issue that we have to address. I think that you should address it. And somewhere along the line, I think the circuit has to address it, because it's going to be an ongoing issue. And you didn't quite answer my question. Can this panel address an issue where the law of the circuit says that the absolute test applies? I don't think you can overrule circuit precedent, but I think you can remand back again to the trial court to examine, to look at a different test and see if it makes a difference in his analysis. I think if the court were to use the test that they used in Detroit in the Sixth Circuit case on comparative disparity and review it under that focus, then we would have a record that can really deal with this issue. And I think that's why these are two important issues. Well, there is a record. The district court made factual findings. And the judge basically, the court made the finding that there was not an absolute disparity of 7.7%. It was 2.87%. Yes. And, you know, that. If he's right in his calculations, does the rest of what the court ruled follow from that? No, because really the figures here in this jury poll for Mr. Mujahid was the same as it was in Detroit. That's not my question. I guess maybe I didn't make the question clear. Your argument is that the disparity is actually much more than 2.87%. Yes. So if it's only 2.87%, if that is a correct calculation, does that mean that under Ninth Circuit law your client does not prevail on this issue? Yes, unless you use a comparative disparity analysis, he would not win. Okay. Unless the court has any other questions. You have some rebuttal time remaining, which I gather is what you want to do, so we'll hear. Yes, thank you. We'll hear from the government. May it please the Court. My name is Joanne Farrington, and I represent the government in this case. I, too, in light of the choice made by the defendant, will focus on the two issues of the jury selection and the Giglio matter. On the Giglio matter, where information comes to light later, is there a different procedure, or do we stand on the fact that this wasn't raised in the district court? In this case, I don't believe this matter has ever been raised in any way whatsoever in the district court. Ordinarily what happens when information comes to light at some point after trial is the defendant either makes a motion for a new trial based on newly discovered evidence, which he has a three-year window of opportunity to do that under the rules, or it raises the issue in the context of collateral attack on his conviction. In this case, there's been no motion. There's been no collateral attack. There's no record. There have been no findings of fact. There have been no rulings by the district court. There is no final order for this court to review at this point on this matter. I don't believe that this court properly should consider the Giglio claims by the defendant here. But moving on to the merits of the case, I have been unable to find any case certainly in the Ninth Circuit in which the court suggested in any way that the government has an obligation to provide impeachment information on the defendant's witness. The defendant argues here that should there be a separate rule if the government, if the person is a government agent. In this case, he was not a government agent. He was, in fact, not necessarily a co-conspirator, but he was a colleague of the defendant here who entered into his own plea agreement and negotiated a settlement with the government. He was not an undercover agent or operating in any way in the government's direction. So you're saying we wouldn't have to decide that even if we reached the merits? Exactly. The government's obligation. I find that somewhat troubling. If someone is working with or for the government unbeknownst to others, whether that's something that would have to be disclosed in this context. Your Honor, the government's obligations under Brady and Giglio are to provide information either that tend to suggest the innocence of the defendant of the charges that were brought or that would significantly impeach a witness, a government witness. And that's the way it's been articulated in every case that I have observed, that would significantly impeach the testimony of a witness put forth by the government to prove its case. At bottom, though, the obligation is a matter of fairness and justice and to ensure that the jury's verdict is sound. And I can imagine situations where the government might be in possession of information about a defense witness that would be of such significance to the interest of justice that it would need to disclose it. And, of course, the government has an obligation to correct any known false testimony that is presented to the court. Right. That's a separate issue. And I think that the two overlap. I can imagine situations. It's just that this is so far from any situation in which the information that the defense is complaining about could have significantly affected the jury's verdict, particularly since it relates to the testimony of a defense witness. That goes to the harmonist, though, doesn't it? Well, to some extent. And what I'm trying to say is that, yes, there may be circumstances. It's hard for me to imagine what they might be, but I don't want to foreclose the concept that there might be situations where the government is in possession of information that should be disclosed in the interest of fairness and justice and to ensure that a just verdict is reached. But in this case, that was not the situation. Interestingly, the primary bit of information that the defense complains about is the claimed failure to disclose the witness's allegedly false statements when he was interviewed by the FBI initially. He was questioned about that in his direct testimony and testified accurately. Yes, I lied to the FBI when they first talked to me. I said I had nothing to do with it. The defendant claims that he didn't know about it, but, in fact, he brought it out. Did the government attempt to impeach him in any way? No. As far as the government is concerned, he was cross-examined, and as far as the government is concerned, he testified accurately about the facts as to which the defendant wished to bring out. Those included the fact that he owned the storage unit, that he had driven the Mercedes on numerous occasions, that, in fact, the car was insured under his name, that he had purchased the ammunition that Mr. Mujahid was charged with possessing. He testified as to all those facts that the defense wanted to bring out in order to support its theory of the case, and he testified accurately. Unless there are other questions on that point, I'll turn briefly to the jury issue. The question of the statistical analysis to be applied in deciding jury community representation issues is not an easy one, particularly when you get down to small numbers. And most recently, the Supreme Court in Burgess v. Smith said there seemed to be problems with almost every way of analyzing it. But at this point, the Ninth Circuit case law is that absolute disparity is the test. It has held unequivocally that an absolute disparity of less than 7.7 percent, which is the difference between the percentage of an identifiable minority in the general population, usually as disclosed by the census figures, and the percentage in the jury pool, is not substantial underrepresentation, that when it gets down to that number, the other forces that come into play in making up the jury pool are more than adequate. In response to the argument that if you have a population that is less than 7 percent in absolute numbers, that there could never be a showing under that law that we apply now of a disparity sufficient to make a claim. I do believe that if there is a showing, for instance, that there is some substantial barrier to participation by the identified minority in whatever test is used to draw. Usually the draw is from registered voter lists, as it is here in the District of Alaska. There certainly are places and times in our history where there have been substantial barriers to registration. If a showing of that sort is made plus no minority representation, then I think that the court might consider whether another test might be appropriate in that circumstance. But here it's a very small difference. It was only 2.8 percent disparity, and that simply is not a particularly large number, particularly in light of the numbers of individuals who are excluded from the jury pool, noncitizens, members of the military, felons, individuals with serious disabilities. All those people are automatically excluded. And so there has to be, under the law, a substantial margin before underrepresentation becomes significant. Is the actual jury irrelevant to all this? I mean, in a way, it sort of strikes me in this case very unusually because we're arguing over here about the theoretical pool, and the actual jury was a model of cross-section. It is ironic. But, in fact, the defendant's right under the Sixth Amendment is to have a jury drawn from the community. And statistically, since there are only 12 people on the jury, it could be, even under the broadest and most representative jury pool, it could all be of any particular group. It does happen. In this case, it happened to happen that it was a particularly good cross-section. But, in fact, the right is to have the jury drawn from a fair cross-section of the community. I do believe that, given the fact that this circuit has clearly held that the absolute disparity test is a test, this panel can't, standing alone, reject that test at this point. So, unless the court has additional questions. Is the District of Alaska divided into divisions? It is. There's an Anchorage division. There is a division that's denominated the Anchorage division. Yes. It includes a huge geographic area. It includes the Kenai Peninsula. It includes the entire valley north of the city. Does it include southeast? No, it does not include southeast. It includes the Aleutians. Geographically, it's very large. Unfortunately, in terms of figuring out the population statistics, the census doesn't break things down the same way that Alaska is divided into divisions. So, to come up with a fair approximation of what the population in this division is, the district court looked at the three most highly populated election divisions within the Anchorage division, added all those numbers together, and came up with a reasonable approximation. Thank you. Thank you, counsel. Mr. Kertner, you have quite a bit of time remaining, if you'd like to use it for rebuttal. Your Honor, I'll use a little bit of time, and maybe I can save some time for the next time you come to Alaska. I just want to address two issues really quickly. As far as the Giglio issue, I would just ask the court to review the letter that's in excerpts 52, pages 52 to 58. Compare that. That's the Giglio letter from the government on the upcoming trial about Mr. Zabato,  and I think that you'll see that he was an agent working as an informant for the government in some extent, and also that it was not harmless there. On the jury issue, I know that you understand the problem, and it's just a suggestion of a possible solution to this problem, at least here in Alaska. Alaska's jury plan uses registered voters, and this is where many circuits and districts have. But Alaska is unique in the sense that we have a pool of prospective jurors that are used on state court from the permanent fund dividend. And Anchorage is actually, and the Division of Anchorage, is becoming a much more diverse community. If you go to Costco here in Anchorage, you'll see a very diverse community. If you come to federal court and look at a jury pool, you will not. And a solution to that would be to use the permanent fund dividend that includes almost everybody who lives here, who has any, almost everybody who's of age and who's eligible for the permanent fund dividend. That's what they use in state court. It would be an easy solution to this problem, perhaps, but this district would have to change its jury plan. I think the question is, is the district constitutionally compelled to change to a different measure? No. I don't think under current law they're not. But if you were to look at the test we have and actually look to a comparative disparity test, then they may be compelled to. And that's, I guess, the point of the issue that we raise here. Thank you very much. Again, we appreciate the arguments of both counsel. They've been very helpful. The case just argued is submitted.
judges: Alarcon, Graber, Bybee